UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

MICHELE FERA,

                              Plaintiff,

           v.                                       1:06-CV-1278
                                                         (LEK/RFT)

THE CITY OF ALBANY, ALBANY POLICE
DEPARTMENT, MICHAEL COLBERT,
ROBERT SANTASKI, ERIC SPRAGUE,
KAMRJ SINGH, MERLIN LaROSE, JOHN
DOE, an employee or employees of the
Albany Police Department, and JANE DOE,
an employee or employees of the Albany
Police Department,

                              Defendants.

_____

### DECISION and ORDER[1]

        Plaintiff Michele Fera commenced the instant action asserting claims under 42 U.S.C. §

1983 and various state law causes of action arising out of her arrest and transportation by the City of

Albany Police Department.  Presently before the Court is Defendants' Motion for summary judgment,

pursuant to Fed. R. Civ. P. 56, seeking dismissal of the Complaint in its entirety.  See Motion for

Summ. J. (Dkt. No. 37).

**I.        FACTS**

        On October 21, 2005, Plaintiff was at the Department of Social Services in the City of

Albany.  She was twenty-three years of age.  While in the waiting room, Plaintiff, who suffers from

idiopathic epilepsy, had a seizure.

_____

           [1]  For printed publication by the Federal Reporters.

Emergency Medical Services responded to the scene.  Plaintiff permitted the paramedics to take her vitals, but refused any other treatment.  At some point in time, Plaintiff was instructed to leave the building.  Plaintiff refused to leave.  The Albany Police Department was called.  Defendants Albany Police Officers Michael Colbert and Robert Santaski were dispatched to the location.  The officers attempted to persuade Plaintiff to leave on her own.  Ultimately, Colbert advised Plaintiff that he would have to arrest her if she continued to refuse to leave.  Plaintiff responded by placing her hands behind her back.  Colbert placed handcuffs on Plaintiff and arrested her on charges of trespass.  Plaintiff walked out of the building with the officers.

Once outside, Plaintiff was placed in the back of Santaski's patrol car to await the arrival of the transport van.  Plaintiff testified that while she was in the back of the police car, she told one of the arresting officers that she was epileptic and feeling warm because she was about to have a seizure, and had a medical identification bracelet in her purse.  The officer, according to Plaintiff, responded by opening the car door so she could get some air, but did not verbally respond.  She claims that she told the officers more than once that she was about to have a seizure, including again when they were moving her from the police car into the police transport van.  Also, Robert Austin, Jr., a security officer at the building, testified that he told the officers as they were exiting the building that Plaintiff had suffered a seizure on the premises earlier in the day.  Defendants contend that Colbert and Santaski were not aware that Plaintiff was an epileptic; that she had received medical treatment at the Department of Social Services earlier in the day; that Plaintiff contended that she had a medical condition; or that she was about to have a seizure.  Plaintiff was assisted into the van, where she sat on the bench.  She remained handcuffed.  Thereafter, believing she was going to have a seizure, Plaintiff positioned herself on the floor of the van.  When Plaintiff arrived at the police station, she was lying on

the floor of the van and was unresponsive. Plaintiff testified that when the officer opened the van door, she was in the postictal state she typically experiences, meaning that she could feel and hear but not move or speak. When Plaintiff opened her eyes, she was being brought into the police station by the elbows, and waking up on the floor of the police station.

Defendant Albany Police Officer Eric Sprague was in central booking when the transport van arrived with Plaintiff. Sprague tapped on Plaintiff's feet a few times while she was laying on the floor and told her to get up and stop faking.[2] Plaintiff did not respond. Upon determining that Plaintiff continued to be unresponsive, Sprague then removed Plaintiff from the van. Sprague contends that he removed Plaintiff by grabbing her shin area using both hands and gently pulling her towards the back of the van. Plaintiff contends that she was grabbed by her ankles and pulled out of the van in a manner that caused her face to repeatedly bounce off the floor of the van.

Defendant Albany Police Officer Kamraj Singh assisted Sprague in carrying Plaintiff from the van to the booking room. After Plaintiff's hips and waist cleared the back of the vehicle, Defendants let go of Plaintiff's ankles and her feet dropped to the ground. Defendants carried her into the booking room while supporting her upper body. Once in the booking room, Plaintiff was placed on a bench. Plaintiff's body leaned to the right and she ended up laying on the bench. Defendants then believed that Plaintiff was having a seizure while in the booking room. Plaintiff was placed on the floor and the handcuffs were removed. Emergency Medical Services was called and responded to the booking room.

---

[2] Sprague testified at deposition that it is common for prisoners to fake illness in the hopes of receiving favorable treatment. He further testified that he initially believed Plaintiff might be faking her illness.

Plaintiff advised the EMS personnel that her chief complaint was face pain.  She claims to have suffered bruising to her face, right elbow, and right hip as a result of the manner in which the officers removed her from the van.  On October 22, 2005 (the day after the above incident), Plaintiff received treatment at the Albany Medical Center and was diagnosed with a mild concussion, facial contusions, and a fractured rib.

## II.        STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  In applying this standard, courts must "'resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'"  Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001) (quoting Cifra v. General Electric Co., 252 F.3d 205, 216 (2d Cir. 2001)).  Once the moving party meets its initial burden by demonstrating that no material fact exists for trial, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (citations omitted). Rather, the non-movant "must come forth with evidence sufficient to allow a reasonable jury to find in her favor."  Brown, 257 F.3d at 251 (citation omitted).  Bald assertions or conjecture unsupported by evidence are insufficient to overcome a motion for summary judgment.  Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir. 1991); Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990).

III.     DISCUSSION

    a.          **Excessive Force**

Plaintiff asserts an excessive force claim against all of the officers, encompassing the period

from her initial contact with the arresting officers, Defendants Colbert and Santaski, through her

detainment in the police station subsequent to her removal from the police van.  Plaintiff claims that, in

light of her lack of resistance to arrest and the testimony of two deponents that the arresting officers

had been told that she had epilepsy and was experiencing the physiological warning signs of an

imminent seizure, Defendants used excessive force when they placed her, while handcuffed, alone in

the police van.  Plaintiff also claims Officers Sprague and Singh used excessive force when they

removed her from the van, causing bruises and a fractured rib.  Defendants responded that they did not

use excessive force and that there is insufficient evidence demonstrating that Plaintiff's injuries were

caused by Defendants' actions rather than by Plaintiff's frequent seizures.

Excessive force claims are analyzed under the Fourth Amendment's objective

reasonableness test.  Whether police conduct is reasonable under the Fourth Amendment "requires a

careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment

interests against the countervailing governmental interests as stake."  Graham v. Connor, 490 U.S. 386,

394, 396 (1989).  "Under this test, Courts must look to the facts and circumstances of each case,

including the severity of the crime, whether the suspect poses an immediate threat of safety to the

officer or others, whether the suspect is actively resisting arrest, and whether the suspect is attempting

to evade arrest by flight."  Id. (internal quotations and citations omitted).  "The 'reasonableness' of a

particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  Id.  "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers . . . violates the Fourth Amendment." Id. at 397 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)).  However, the Second Circuit has established that "[a]lthough handcuffing will be the reasonable course in many, if not most arrest situations, we do not accept the principle that handcuffing is *per se* reasonable or that Graham v. Cooper requires such a conclusion."  Soares v. Connecticut, 8 F.3d 917, 921 (2d Cir. 1993) (discussing Graham, 490 U.S. at 386-396).

The Court first turns to the evidence concerning the events up to and including the placement of Plaintiff in the police wagon.  Defendants Michael Colbert and Robert Santaski were the arresting officers.  It is undisputed that Plaintiff did not resist efforts to be arrested and walked out of the building with the officers.  She was being arrested for trespass after refusing to leave the Social Security building, where she had appeared for a hearing, and there is no evidence that she threatened violence.  Of course, without additional evidence, the continued use of handcuffs and the placement of Plaintiff in the police wagon in these circumstances could not be the basis for an excessive force claim.  However, as discussed *supra*, Plaintiff testified that she told the arresting officers that she was epileptic, had a medical alert bracelet in her purse, and felt she imminently was going to suffer a seizure; and additionally, Security Officer Robert Austin testified that he informed the officers, as they were escorting Plaintiff out of the building in handcuffs, that she had suffered a seizure on the premises earlier in the afternoon.

While the Second Circuit has not spoken on the narrow issue of whether officers' knowledge of a suspect's medical condition may be sufficient to make a particular amount of force

objectively unreasonable, <u>Soares</u> requires an examination of the specific situation to determine the reasonableness of even a slight application of force.  <u>Soares</u>, 8 F.3d at 921.  Officers' awareness of information about a suspect's vulnerability due to a medical condition obviously is a circumstance that is relevant to the reasonableness of a particular use of force.  Therefore, crediting the testimony of Robert Austin and/or Plaintiff, a reasonable jury is not be precluded from finding that the officers' actions–placing Plaintiff, alone and handcuffed, in the police wagon without having made any effort to consult a medical authority–failed to be objectively reasonable.

With respect to Officer Singh and Officer Sprague, the inquiry focuses on the manner in which Plaintiff was removed from the van in light of the facts that she was unresponsive, lying on the floor of the van, and handcuffed.  Other relevant circumstances include that she weighed only ninety-seven (97) pounds, had no criminal history, and had not resisted arrest.  There is a triable issue of fact as to whether the manner in which Plaintiff was removed was, objectively speaking, reasonable.  Plaintiff testified that there was space in the van for two people to access her, turn her over, and/or take other measures to avoid dragging her face down.  Defendant Sprague testified that he removed Plaintiff in the manner that he did because: (1) there was insufficient room in the van for him to enter it, flip Plaintiff over, and then attempt to remove her; (2) there was no other way to remove her; and (3) there was concern that if she was not immediately removed, she might suffer positional asphyxia.[3]  Thus, there may have been some sense of urgency requiring Sprague to remove Plaintiff from the van in the manner that he did due to the possibility she could asphyxiate in light of the manner in which she was handcuffed and lying in the van.  Sprague further claims that he removed Plaintiff gently from the van.

---

[3] Positional asphyxia is a difficulty breathing due to one's posture or position.  <u>See Jones v. City of Cincinnati</u>, 521 F.3d 555, 558 (6th Cir. 2008).

On the other hand, if it is found that Sprague could have entered the van to remove Plaintiff in another fashion, the potential for asphyxia was not a legitimate concern, and/or Plaintiff's ribs were injured or her face bruised during the course of being removed from the van, then a fair-minded trier of fact could reasonably conclude that Plaintiff was removed in an unnecessarily rough manner and that she could have been extricated from the van in a fashion less likely to cause injury.

It is questionable whether Plaintiff will be able to demonstrate that her injuries were caused by the manner in which she was removed from the van.  Defendants contend that they gently removed Plaintiff from the van.[4]  Other than Plaintiff's testimony, the only evidence of causation in the record is the affidavit of Michael Dailey, M.D., who states that "[i]f Ms. Fera suffered no impact to her rib area other then when she was removed from the police van and if her rib area impacted the rear of the police van when she was being removed from . . . the floor of the van. . ., I believe that this impact to her ribs was a cause of the rib injury, including the clinically diagnosed rib fracture."  Dailey Aff. ¶ 7 (Dkt. No. 40).  Dailey similarly states that "[i]f Michele Fera did not sustain any other impact to her body shortly before October 22, 2005 that led to observable bruising and if she was dragged along the floor of a police van, it is my opinion that a cause of the bruising I observed on Ms. Fera was the impact of her being dragged along the floor of the police van."  Id. at ¶ 6.  Of course, these opinions are dependent upon evidence that: (1) Plaintiff's prior seizures did not cause the bruising and/or fracture (including the seizure she experienced that same day in the Department of Social Services and the seizure she experienced in the back of the van); (2) with respect to the bruising, Plaintiff was dragged along the floor of the van in a manner likely to cause bruising; and (3) with respect to the fracture, that her rib

---

[4] This contention appears to be substantiated by the video submitted as Exhibit Z.  Because, however, the video does not enable the viewer to see Plaintiff's face while she is being pulled out of the van, a question of fact remains.

area impacted the rear of the police van.  In support of this theory of causation, Plaintiff points to her testimony from the 50-h hearing where she stated that her "face was bouncing off the ground of the van."  Def. Ex. S at 29.  Plaintiff did not testify specifically that her ribs impacted the rear of the van.[5]

Viewing the evidence in the light most favorable to the non-movant, it cannot be said that there is no evidence from which a fair-minded trier of fact could reasonably conclude that the rib fracture and/or bruising was caused by the manner in which Plaintiff was removed from the van. Based on Plaintiff's testimony that she did not have any prior injuries, the testimony of Robert Austin that he did not observe any bruises on Plaintiff when she was placed in the van, the fact that Defendants admit pulling Plaintiff out of the van by her feet,[6] and the fact that Plaintiff complained of pain in her face once in the booking room of the police station, a jury could find that Plaintiff was removed from the van in a manner that caused the injuries.  Accordingly, the Court finds that there are triable issues of fact on the excessive force claim.[7]

> **b.**        **Qualified Immunity**

---

[5] In response to the question whether the torso portion of Plaintiff's body was touching the van while the officers were pulling her along the floor, Plaintiff responded "[n]o."  Def. Ex. S at 29. Plaintiff further testified that her torso was still in the van when Defendants dropped her legs from the van, lifted her up by her arms, and dragged her into the police station.  Id. at 31.

[6] The video at Exhibit Z confirms that Plaintiff was removed from the van by her legs and/or feet.

[7] There is not evidence to support an excessive force claim against Defendant LaRose because he was not personally involved in placing Plaintiff in the police wagon or removing her, and apparently did not have authority to be involved with these acts.  Farrell v. Burke, 449 F.3d 470, 484 (2d Cir. 2006) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983 .") (internal quotations and citation omitted).

Defendants claim they are entitled to qualified immunity on the excessive force claim. "Qualified immunity is an affirmative defense that shields government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."   Stephenson v. Doe, 332 F.3d 68, 76 (2d Cir. 2003). The Court finds that the same unresolved factual issues that are material to the excessive force claim preclude a decision about qualified immunity.

"As a general rule, police officers are entitled to qualified immunity if (1) their conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights." Kerman v. City of New York, 374 F.3d 93, 108 (2d Cir. 2004) (Kerman IV) (quoting Oliveira v. Mayer, 23 F.3d 642, 648 (2d Cir. 1994), cert. denied, 513 U.S. 1076 (1995)).  Whether or not a right was clearly established at the time of their conduct is a question of law.  Kerman IV, 374 F.3d at 108.  To determine if a right is clearly established, a court examines (1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and Second Circuit support the existence of the right in question; and (3) whether under preexisting law a reasonable officer would have understood that his or her acts were unlawful.  See Soares, 8 F.3d at 922.

When there is a dispute of material facts concerning the officers' conduct, a resolution of the facts by the jury is usually a necessary predicate to the Court's resolution of the legal issue of whether the officers are entitled to qualified immunity.  Saucier v. Katz, 533 U.S. 194, 201-202 (2001), quoted in Stephenson, 332 F.3d at 77; Kerman IV, 374 F.3d at 109.  This is because even if a jury finds that Defendants used excessive force, Defendants may be entitled to qualified immunity if the Court, relying on the factual findings of the jury, determines that "a reasonable official would reasonably

believe his conduct did not violate a clearly established right." Kerman IV, 374 F.3d at 109. See Stephenson, 332 F.3d at 77 (explaining that "even officers who are found to have used excessive force may be entitled through the qualified immunity doctrine to an extra layer of protection 'from the sometimes hazy border between excessive and acceptable force.'") (quoting Saucier, 533 U.S. at 206).

However, defendants may prevail on a qualified immunity defense at summary judgment, despite outstanding factual issues material to an excessive force claim, when they "can show that the rights plaintiff claims to have been violated were not clearly established." Soares, 8 F.3d at 922. With regard to removing Plaintiff from the police wagon, it is obvious that Defendants cannot make this showing because it is clearly established that suspects possess a general right to have officers use only the amount of force that is "reasonably necessary." See, e.g., Robison v. Via, 821 F.2d 913, 923-924 (2d Cir. 1987). With regard to handcuffing Plaintiff and placing her in the police wagon, the inquiry is whether it was clearly established that the officers must consider Plaintiff's medical vulnerability. Soares clearly established that the reasonableness of any use of force depends on the circumstances and that even handcuffing is not per se reasonable. See id. By broadly requiring that all relevant circumstances inform officers' use of force, the Second Circuit avoided the need to specifically state that officers must take account for a suspect's medical condition. In short, a reasonable officer would know that the amount of force to use after arresting a non-resisting suspect for trespass should be influenced by information that an arrestee was experiencing the physiological symptoms of an imminent epileptic seizure and had suffered a seizure earlier in the afternoon; and also, would know not to leave such an arrestee alone and handcuffed in a police wagon for the drive to the station house.

Because of the unresolved factual issues, the Court cannot determine whether the officers are entitled to qualified immunity.[8]

       c.       **Municipal Liability under § 1983**

Defendants City of Albany and the Albany Police Department move for summary judgment dismissing the 42 U.S.C. § 1983 claim, arguing that Plaintiff has produced no evidence that could be construed as making them culpable within the narrow scope of municipal liability under § 1983. Plaintiff states that "Defendant City of Albany does not have a policy addressing the manner for dealing with persons who complain of an impending loss of consciousness or for dealing with one who loses consciousness." Pl. Mem. of Law at 9.  According to Plaintiff, "[h]ad an appropriate policy been in place, Defendants would not have handcuffed an epileptic young lady behind her back and placed her alone in a van, where she lost consciousness." Id.  Plaintiff also argues that municipal liability under § 1983 can be grounded on the internal investigation of this incident. Id. at 11.  Plaintiff argues the investigation was inadequate and demonstrates a toleration for constitutional violations, since the investigation concluded that it could not be determined whether Plaintiff had told the officers that she was epileptic when she was taken into custody but failed to interview Security Officer Austin.  Id.

Municipalities are liable under 42 U.S.C. § 1983 when the alleged unlawful action was implemented or executed pursuant to a governmental policy or custom. Reynolds v. Giuliani, 506 F.3d 183, 190 (2d Cir. 2007).   The failure to properly train police officers may constitute a municipal policy for purposes of § 1983 liability.  City of Canton v. Harris, 489 U.S. 378, 388 (1989).  To prevail under

---

     [8] The same unresolved factual issues prevent the Court from resolving Defendants' entitlement to qualified immunity under New York state law with respect to the state law claims. Cf. Jones v. Parmley, 465 F.3d 46, 64 (2d Cir. 2006).

a failure to train theory, Plaintiff must demonstrate that "the need to act is so obvious, and the inadequacy of current practices so likely to result in a deprivation of federal rights, that the municipality or official can be found deliberately indifferent to the need." Reynolds, 506 F.3d at 190 (citing City of Canton, 489 U.S. at 390). To demonstrate deliberate indifference, a plaintiff is "required to submit evidence that defendants knew to a moral certainty that the City would confront a given situation; the situation presented the City with a difficult choice or there was a history of its mishandling the situation; and the wrong choice by the City would frequently cause the deprivation of plaintiffs' rights." Reynolds, 506 F.3d at 190. "'A training program must be quite deficient in order for the deliberate indifference standard to be met: the fact that training is imperfect or not in the precise form a plaintiff would prefer is insufficient to make such a showing.'" Id. at 193 (quoting Young v. City of Providence ex rel. Napolitano, 404 F.3d 4, 27 (1st Cir. 2005)).

Plaintiff concedes that "Defendant has a policy for dealing with injured persons." Pl. Mem. of Law at 9. According to Plaintiff's theory, the absence of "a policy addressing the manner for dealing with persons who complain of an impending loss of consciousness or for dealing with one who loses consciousness" constitutes the inadequacy. Id. In fact, the relevant section of the Albany Police Department policy states, *inter alia*, the following:

> When it becomes apparent that an arrested person is having a medical emergency, which is a prisoner who is: a) experiencing pain, requesting medical treatment, visually injured, in danger of dying or sustaining serious bodily harm due to a physical problem or injury (including self inflicted injuries) . . . an Albany Fire Department Emergency Medical Services unit shall be immediately summoned to treat the arrested person.

Def. Exh. Q at 1 (Dkt. No. 37, Attach. 19). Another section of the policy explicitly addresses the period before an arrested person is transported: "When a prisoner, prior to being transported to Central Booking, complains of illness or injury, a supervisor shall be notified immediately and EMS

summoned to the scene.  [] Transport prisoner via ambulance. . . ." Def. Exh. R at 1 (Dkt. No. 37, Attach. 20).  According to any reasonable interpretation, these policies encompass a situation in which a prisoner stated to an arresting officer that she was about to lose consciousness or have an epileptic seizure, which are the circumstances Plaintiff testified to in the present action.  Therefore, under the standard adopted by the Second Circuit in <u>Reynolds</u>, Plaintiff has failed to proffer evidence that could sustain a finding of deliberate indifference by the municipal Defendants.  Additionally, Plaintiff has not demonstrated that Defendants have a history of mishandling similar situations.  Plaintiff asserts merely that another individual was injured while being removed from a police van, but fails to suggest a connection between that instance and allegedly insufficient training of officers on how to deal with a prisoner's impending loss of consciousness.  Pl. Mem. of Law at 11-12.

        With regard to Plaintiff's attempt to ground municipal liability in § 1983 on the allegedly insufficient internal investigation into the incident, no evidence has been proffered from which a trier of fact could infer "a municipal policy that permits or tolerates unconstitutional acts by city employees." <u>Fiacco v. City of Rennselaer</u>, 783 F.2d 319, 326 (2d Cir. 1986).  Plaintiff made a complaint to the Office of Professional Standards at the Albany Police Department.  An investigation gathered written responses from several officers and other employees who were involved with or were known to witness the events that were the subject of the complaint, and resulted in a written report summarizing the evidence.  <u>See</u> Def. Exh. N (Dkt. 37, Attach. 16).  The only evidence asserted by Plaintiff in support of this claim is that the investigation did not elicit from Security Officer Austin the statement that he heard Plaintiff inform the officers that she had epilepsy.  <u>See</u> Pl. Mem. of Law at 9-11.  In light of the documentation submitted about the investigation, this does not constitute investigatory conduct that suggests the toleration of unconstitutional acts.  <u>See, e.g.</u>, <u>Fiacco</u>, 783 F.2d at

- 14 -

(finding evidence sufficient for municipal liability when there was evidence of a pattern of police

brutality yet the police chief did not open an investigation into any of them and repeatedly failed to

interview the accused officers or take a formal statement of the claim from the civilian complainant);

Hogan v. Franco, 896 F. Supp. 1313, 1317, 1320  (N.D.N.Y. 1995) (finding evidence sufficient for

municipal liability when the police department had no formal procedures for investigating complaints,

complaints were investigated informally by fellow officers, and the instant investigation determined a

police brutality complaint was unsubstantiated despite photo evidence).

Accordingly, the § 1983 claim against the City of Albany and the Albany Police Department

is dismissed.[9]

### d.    American With Disabilities Act and Human Rights Law § 296

Defendants next move to dismiss Plaintiff's claim under the Americans with Disabilities Act

("ADA") on the ground that: (1) Defendants were unaware of her epileptic condition at the time she

was transported to the police station; and (2) she has failed to demonstrate a policy that excludes

persons with her condition from receiving accommodations.

Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such

disability, be excluded from participation in or be denied the benefits of the services, programs, or

activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

Section 504 of the Rehabilitation Act similarly provides in pertinent part that "[n]o otherwise qualified

individual with a disability . . .  shall, solely by reason of his or her disability, be excluded from the

---

[9] Given this conclusion that the municipal Defendants cannot be liable for damages, the so-called official capacity § 1983 claims against the officers are dismissed.

participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . ."

To state a claim, Plaintiff must demonstrate that: (1) she is a qualified individual with a disability; (2) she was denied the benefits of a program or activity or otherwise discriminated against on account of her disability; and (3) the Defendant is a public entity.  Ford v. Conway, 2004 WL 1071171, *3 (W.D.N.Y. 2004); see also Gorman v. Bartch, 152 F.3d 907, 911 (8th Cir. 1998).  To recovery monetary damages, a plaintiff must demonstrate intentional discrimination.  Bartless v. New York State Bd. of Law Examiners, 156 F.3d 321, 331 (2d Cir. 1998).  Intentional discrimination does not require personal animosity or ill will.  Id.  A plaintiff may recover under Title II or Section 504 "upon a showing of a statutory violation resulting from 'deliberate indifference' to the rights secured the disabled by the acts."  Garcia v. SUNY Health Sciences Center of Brooklyn, 280 F.3d 98, 115 (2d Cir. 2001).

To the extent Plaintiff asserts ADA claims against the individual Defendants, such claims must be dismissed because "neither Title II of the ADA nor § 504 of the Rehabilitation Act provides for individual capacity suit. . . ."  Garcia, 280 F.3d at 107.

Turning to the substance of these claims, Defendant City of Albany does not argue that Plaintiff is not a qualified individual with a disability or that it is not a public entity.  See Gorman, 152 F.3d at 912 ("A local police department falls squarely within the statutory definition of public entity.") (internal quotations and citation omitted).  "Transportation of an arrestee to the station house is . . . a service of the police within the meaning of the ADA."  Id. "The 'benefit' [Plaintiff seeks] . . . in this case [is] to be handled and transported in a safe and appropriate manner consistent with [her]

disability."  Id.  Because the statutes apply to this case, the remaining question is whether Plaintiff was discriminated against on account of her disability.

Plaintiff contends that she was discriminated against because Defendant placed her alone in the back of the van despite knowing her condition and that she was about to have a seizure.  Defendant responds that it was unaware of Plaintiff's epileptic condition.  In light of Robert Austin's testimony that he told the police that Plaintiff had an epileptic seizure on the morning of the subject incident and the testimony of Defendants Colbert and Santaski that they were unaware that Plaintiff had a seizure, Defendant's knowledge of Plaintiff's condition is a triable issue of fact.  Even if Defendant had such knowledge, there remains a triable issue of fact concerning whether its actions, through its police officers, constitute deliberate indifference to Plaintiff's rights under the ADA.[10]

### e.        Intentional Infliction of Emotional Distress

Defendants next move to dismiss the emotional distress claim on the ground that such claims may not be maintained against government entities and individuals sued in their official capacities.  "Public policy bars claims for intentional infliction of emotional distress against a governmental entity."  Liranzo v. New York City Health and Hosps. Corp., 300 A.D.2d 548 (2d Dep't 2002); see also Lynch v. State, 2 A.D.3d 1002 (3d Dep't 2003).  Therefore, the claim against the municipal Defendants must be dismissed.

Interpreting New York state law, the Second Circuit held that police officers may be liable for intentional infliction of emotional distress if they are not entitled to qualified immunity under state law.  See Parmley, 465 F.3d at 55, 63-64 (citing Arteaga v. State, 72 N.Y.2d 212, 216-217 (1988)).  As

---

[10] The same reasoning applies to Plaintiff's claim under § 296 of the New York Human Rights Law.

discussed *supra*, there are unresolved factual issues that prevent resolution of the qualified immunity

issues at this juncture.  <u>See</u> *supra* n.4.  If the Court ultimately finds that the officers are not entitled to

qualified immunity, then an emotional distress claim against the officers is not barred..

> To state a claim for the intentional infliction of emotional distress, Plaintiff must

demonstrate that:

> > (1) defendant's conduct toward plaintiff was so outrageous and shocking that it
> > exceeded all reasonable bounds of decency as measured by what the average
> > member of the community would tolerate; (2) plaintiff suffered severe emotional
> > distress; (3) defendant's conduct caused such distress; and (4) defendant acted
> > either (a) with the desire to cause such distress to plaintiff, (b) under
> > circumstances known to defendant which made it substantially certain that that
> > result would follow, or (c) recklessly and with utter disregard of the
> > consequences.

<u>Brewton v. City of New York</u>, — F. Supp.2d —, 2008 WL 1958955, at *10 (E.D.N.Y. 2008).

Interpreting all of the evidence in the light most favorable to Plaintiff, Defendants' acts of locking

Plaintiff, alone and handcuffed, in the paddy wagon after being told she had just suffered a seizure and

was about to have another seizure, and/or dragging her out of the paddy wagon while she was

unresponsive, could support a finding of liability for intentional infliction of emotional distress.

Furthermore, Plaintiff testified to the emotional distress that she experiences as a result of this incident,

stating, *inter alia*, that "given the way I was treated by police officers, I don't necessarily feel

comfortable if I'm out in public . . . ."[11]  Pl. Dep. at 83.

---

[11] Although Plaintiff testified that she did not seek psychological counseling for the distress,
the Court finds that this is not a persuasive indicator of the severity of her emotional distress in a
case where there is corroborated testimony that on several instances, she refused emergency medical
treatment even in the immediate aftermath of seizures due to a lack of health insurance.

The intentional infliction of emotional distress claim is dismissed against Defendant LaRose, however, because there is no evidence suggesting that he was told Plaintiff felt she was going to have a seizure.  His involvement was, according to the undisputed evidence, limited to driving the paddy wagon.  Therefore, even if he heard and ignored Plaintiff banging on the wagon, this is not the sort of outrageous conduct that can support this claim.

     **f.**        **State Constitutional Claims**

Defendants move to dismiss Plaintiff's claims under art. 1, § 1 and art. 1 § 5 of the New York State Constitution on the ground that she fails to state a claim under either provision of the State Constitution.

Article 1, § 1 provides that:

> No member of this state shall be disfranchised, or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land, or the judgment of his or her peers, except that the legislature may provide that there shall be no primary election held to nominate candidates for public office or to elect persons to party positions for any political party or parties in any unit of representation of the state from which such candidates or persons are nominated or elected whenever there is no contest or contests for such nominations or election as may be prescribed by general law.

This claim must be dismissed because Plaintiff fails to articulate a sustainable basis for this claim. This section was "intended to restrict the powers of the legislature and to prevent any act which would deprive a party of his rights or disfranchise him until it was ascertained judicially that they had been forfeited."  Green v. Shumway, 39 N.Y. 418 (1868).  Other provisions of the New York Constitution provide a more direct basis for Plaintiff's claimed injuries.

Article 1, § 5 provides that "[e]xcessive bail shall not be required nor excessive fines imposed, nor shall cruel and unusual punishments be inflicted, nor shall witnesses be unreasonably detained."  The claim under art. 1 § 5 must be dismissed because Plaintiff has failed to point to any legal authority for the proposition that the section applies to pre-trial detainees or that it provides a cause of action for damages.  To the contrary, the cases only seem to apply § 5 to post-trial detainees. See, e.g., Cuoco v. Moritsugu, 222 F.3d 99, 106 (2d Cir. 2000) ("Because as a pre-trial detainee she was not being 'punished,' the 'cruel and unusual punishment' proscription of the Eighth Amendment to the Constitution does not apply.").[12]

### g.       Remaining State Law Claims

Defendants also move for summary judgment dismissing the remaining state law claims in negligence, assault and battery, and negligent infliction of emotional distress, on the ground that the officers' actions were not the proximate cause of Plaintiff's injuries.  However, as discussed *supra*, Plaintiff has raised triable issues of fact as to the proximate cause of her injuries.  Therefore, summary judgment on these claims is denied.

### h.       Municipal Liability in *Respondeat Superior*

Defendants City of Albany and the Albany Police Department argue they are entitled to full governmental immunity, and cannot be held liable in *respondeat superior* for any of the surviving tort claims against the individual officers.  Plaintiff argues that the City and Police Department should be subject to derivative liability.

---

[12] Article 1, § 5 of the New York Constitution uses language similar to that of the Eighth Amendment.

Under New York law, municipalities may be vicariously liable for negligent acts and intentional torts of police officers.  <u>Schuster v. City of New York</u>, 5 N.Y.2d 75, 81-82 (1958) (citing cases); <u>Weeks v. City of New York</u>, 693 N.Y.S.2d 797, 801 (1999) (holding that "where, as here, the dangerous condition does not exist before police intervention, but is then created by the negligent acts of police officers . . . . rather than applying principles of governmental immunity to shield the City from liability, principles of general tort liability should prevail."); <u>Savarese v. City of New York Housing Authority</u>, 567 N.Y.S.2d 855 (2d Dep. 1991) (holding that municipalities may be vicariously liable for intentional torts committed by employees); <u>Wu v. City of New York</u>, 934 F. Supp. 581, 592 (S.D.N.Y. 1996) (holding that "an intentional infliction of emotional distress claim is viable against the City under a theory of *respondeat superior* liability.").  Therefore, the City of Albany and Albany Police Department are denied immunity on the surviving tort claims.

## IV.       CONCLUSION

For the foregoing reasons, Defendants' Motion for summary judgment is granted in part and denied in part.  It is hereby

**ORDERED,** that Defendants' Motion for summary judgment (Dkt. No. 37) on the claims under 42 U.S.C. § 1983 is **GRANTED** as to the City of Albany, the Albany Police Department, Defendant LaRose in his individual and official capacity, and as to Defendants Colbert, Santaski, Singh, and Sprague in their official capacity only, and is otherwise **DENIED**; and it is further

**ORDERED,** that Defendants' Motion for summary judgment (Dkt. No. 37) on the claims under Title II of the Americans with Disabilities Act is **GRANTED** as to the individual Defendants and **DENIED** as to Defendants City of Albany and Albany Police Department; and it is further

**ORDERED,** that Defendants' Motion for summary judgment (Dkt. No.37) on the claim under § 296 of the New York State Executive Law is **DENIED;** and it is further

**ORDERED,** that the Motion for summary judgment (Dkt. No. 37) on the claims of intentional infliction of emotional distress is **GRANTED** as to Defendant LaRose and is otherwise **DENIED**; and it is further

**ORDERED,** that Defendants' Motion for summary judgment (Dkt. No. 37) on the state constitutional claims is **GRANTED**; and it is further

**ORDERED,** that Defendants' Motion for summary judgment (Dkt. No. 37) on the negligence claims is **DENIED**; and it is further

**ORDERED,** that Defendants' Motion for summary judgment (Dkt. No.37) on the negligent infliction of emotional distress claim is **DENIED**; and it is further

**ORDERED,** that Defendants' Motion for summary judgment (Dkt. No. 37)  on the assault and battery claims against Defendant LaRose is **GRANTED** and is otherwise **DENIED**; and it is further

**ORDERED,** that in all other respects, Defendants' Motion for summary judgment (Dkt. No 37) is **DENIED**; and it is further

**ORDERED**, that the Clerk serve a copy of this Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED**.

DATED:     July 30, 2008
             Albany, New York

Lawrence E. Kahn
U.S. District Judge

- 22 -